UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

GUST H. BARDY,

                Plaintiff,

        v.

CARDIAC SCIENCE CORP.,

                Defendant.

CASE NO. C13-0778JLR

ORDER GRANTING MOTION
TO DISMISS

Before the court is Defendant Cardiac Science Corporation's ("CSC") motion to dismiss Plaintiff Dr. Gust H. Bardy's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Mot. (Dkt. # 33).)  CSC and Dr. Bardy collaborated for several years in researching and developing medical devices, but the relationship eventually soured.  CSC and Dr. Bardy's collaboration was governed by a contract, and Dr. Bardy now alleges that CSC breached that contract.  Dr. Bardy alleges five causes of action: two for breach of contract, one for promissory estoppel, one for unjust enrichment, and one for declaratory judgment.  In this motion, CSC moves to dismiss all five causes of

1  action, arguing a different theory of dismissal for each.  The court considers each

2  argument in turn and, having considered the pleadings and held oral argument, and

3  finding all of CSC's arguments to be meritorious, GRANTS CSC's motion and

4  DISMISSES Dr. Bardy's complaint.

5                              **I.    BACKGROUND**

6         Both Dr. Bardy and CSC work in the field of heart disease treatment.  Dr. Bardy is

7  a cardiologist who has experience designing devices to treat and manage irregular

8  heartbeat conditions and diseases (also called "cardiac arrhythmias").  (First Am. Compl.

9  (Dkt. # 29) ¶ 2.)  Dr. Bardy describes himself as an "entrepreneurial cardiologist" with

10  experience designing and executing clinical trials for heartbeat-monitoring devices and

11  conducting research, development, and commercialization for those devices and related

12  software.  (*Id.*)  CSC is a corporation headquartered in Wisconsin that develops,

13  manufactures, and markets heart-related medical devices such as automated external

14  defibrillators, electrocardiograph devices, and similar devices.  (*Id.* ¶ 3.)  CSC has

15  "substantial business activities" in King County, Washington.  (*Id.*)

16         Dr. Bardy and CSC signed an agreement to collaborate in December 2009 titled

17  "Collaboration and Consulting Agreement" (hereinafter referred to as "the Agreement").

18  (*Id.* ¶ 9.)  The purpose of the Agreement was to "form a collaboration and consulting

19  agreement to design, develop, manufacture, commercialize, and use medical devices and

20  diagnostic technologies."  (*Id.*)  Under the Agreement, CSC would provide office space

21  and resources to Dr. Bardy and pay him an annual salary.  (*Id.* ¶ 10.)  In return, Dr. Bardy

22

1  would conduct research and attempt to develop medical devices that could be

2  commercialized by CSC.  (*Id.*)

3       The collaboration yielded a product called the "mySense Monitor."  (*Id.* ¶ 20.)

4  The mySense Monitor is a wearable electrocardiograph monitor about the size of a large

5  band-aid.  (*Id.*)  It continuously monitors and records the electrical activity of the

6  cardiovascular system and heart and transmits the data to its associated software for

7  review and analysis.  (*Id.*)  Dr. Bardy designed and developed this product, which he

8  claims "represents a significant clinical and cost improvement" over prior technology.

9  (*Id.* ¶ 21.)  He also obtained United States Food and Drug Administration ("FDA")

10  approval for the product.  (*Id.* ¶ 20.)

11       However, according to Dr. Bardy, CSC did not do enough to develop the product

12  and bring it to market.  (*Id.* ¶¶ 24-51.)  Dr. Bardy alleges that CSC "failed to take critical

13  and necessary steps for the development of the mySense Monitor" and that, as a result,

14  the product still is not commercially available.  (*Id.* ¶ 24.)  Specifically, Dr. Bardy alleges

15  that CSC failed to pay, or made late payments to, numerous people hired to develop the

16  product, including the main clinical trial doctor, the law firm hired to protect the

17  associated intellectual property rights ("IPR"), the regulatory affairs consultant, the

18  contract manufacturer, and others.  (*Id.* ¶¶ 25, 27-28.)  In addition, Dr. Bardy alleges that

19  CSC failed to provide development services such as software support, legal services, and

20  marketing.  (*Id.* ¶¶ 26, 29, 31.)  Dr. Bardy alleges that this conduct breached the

21  Agreement.  (*Id.* ¶¶ 65-81.)  CSC, for its part, believes that it "has not yet been able to

22  define a business model that will result in an acceptable return on investment."  (*Id.* ¶ 33.)

1    CSC terminated the Agreement on April 9, 2013, (*id.* ¶ 45), and Dr. Bardy filed

2    this complaint against CSC shortly thereafter.  (*See* Not. of Removal (Dkt. # 1).)  The

3    complaint was originally filed in King County Superior Court, but CSC removed it to this

4    court.  (*Id.*)  CSC now moves to dismiss the complaint in its entirety under Federal Rule

5    of Civil Procedure 12(b)(6).  (*See* Mot.)

6                                    **II.    ANALYSIS**

7    **A.    Legal Standard on a Rule 12(b)(6) Motion to Dismiss**

8          Under Federal Rule of Civil Procedure 12(b)(6), a court should dismiss a

9    complaint if it fails to state a claim upon which relief can be granted.  Fed. R. Civ. P.

10   12(b)(6).  In determining whether to grant a Rule 12(b)(6) motion, the court must accept

11   as true all "well-pleaded factual allegations" in the complaint.  *Ashcroft v. Iqbal*, 556 U.S.

12   662, 679 (2009).  Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks

13   sufficient facts to support a cognizable legal theory.  *Balistreri v. Pacifica Police Dep't*,

14   901 F.2d 696, 699 (9th Cir. 1990).  To sufficiently state a claim and survive a motion to

15   dismiss, the complaint "does not need detailed factual allegations" but the "[f]actual

16   allegations must be enough to raise a right to relief above the speculative level."  *Bell Atl.*

17   *Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  The complaint must contain "sufficient

18   factual matter, accepted as true, to state a claim to relief that is plausible on its face."

19   *Iqbal*, 556 U.S. at 663 (internal quotation marks omitted); *see also Telesaurus VPC, LLC*

20   *v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010).  The court is not bound to accept as true

21   labels, conclusions, formulaic recitations of the elements, or legal conclusions couched as

22   factual allegations.  *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265,

ORDER- 4

286 (1986)).  As the Supreme Court said in *Iqbal*, a complaint must do more than tender

"'naked assertions' devoid of 'further factual enhancement.'"  *Iqbal*, 556 U.S. at 678

(quoting *Twombly*, 550 U.S. at 557).

**B.      Breach of Contract Claims**

Dr. Bardy's primary claim is that CSC breached the Agreement by failing to

develop and commercialize the mySense Monitor.  (Am. Compl. ¶¶ 65-81.)  He alleges

that the Agreement required CSC to provide resources and make "commercially

reasonable efforts" to develop and commercialize the product, and that CSC failed to do

that in a variety of ways.  (*Id.* ¶¶ 67-68, 70, 72.)  Further, he alleges that CSC breached

the Agreement by failing to protect the IPR associated with the mySense Monitor.  (*Id.*

¶¶ 70-71, 73.)  Dr. Bardy alleges two different causes of action for breach of contract—

one for injunctive relief, and a second for damages.  (*See id.* ¶¶ 65-81.)

CSC moves to dismiss both.  (Mot. at 9-12.)  CSC argues that Dr. Bardy's breach

of contract claims are barred by a provision in the Agreement.  (*Id.*)  Indeed, there is a

provision in the Agreement that says, explicitly, that development and commercialization

will be undertaken in the "sole discretion" of CSC and that CSC will not be liable for

failing to develop and commercialize products or have any obligation to do so:

> The Development, manufacture, marketing and commercialization of
> Collaboration Products and the sale, licensing and other disposition of
> Collaboration Technology and Collaboration IPR, as the case may be, will
> be guided and undertaken by CSC in its sole discretion.  CSC will not have
> any obligation to, and will not have any liability on account of any delay or
> failure to, Develop, manufacture, market or commercialize any
> Collaboration Products or to sell, license or otherwise dispose of any
> Collaboration Technology or Collaboration IPR.

1    (Am. Compl. Ex. A § 5.12.)  CSC argues that Dr. Bardy's breach of contract claims

2    should be dismissed with prejudice because they are based on conduct that falls under the

3    scope of this clause.  (Mot. at 9-12.)

4        The court agrees.  All of Dr. Bardy's breach of contract claims are based on one of

5    two theories:  first, that CSC failed to make commercially reasonable efforts to develop

6    and commercialize the mySense Monitor, (Am. Compl. ¶¶ 24-26, 28-42, 49, 56-58), and

7    second, that CSC failed to protect the IPR associated with the mySense Monitor.

8    (Compl. ¶¶ 27, 47-51.)  Both of these theories are expressly precluded by the terms of the

9    Agreement.  With respect to development and commercialization, there is no doubt that

10   the Agreement eliminates any obligation on CSC's behalf to develop and commercialize

11   Collaboration Products when it says:  "CSC will not have any obligation to, and will not

12   have any liability on account of any delay or failure to, Develop, manufacture, market or

13   commercialize any Collaboration Products."  (Am. Compl. Ex. A § 5.12.)  Thus, Dr.

14   Bardy's first theory cannot form the basis of a viable breach of contract claim.  With

15   respect to IPR, there is another clause in the Agreement that says explicitly that "each

16   party . . . will have no obligation, to apply for, register, prosecute, perfect, maintain or

17   enforce any of IPR [sic]."  (*Id.* § 6.6.)  Thus, it is clear that CSC had no obligation to

18   protect IPR.  (*See id.*)  There can be no breach of contract claim based on obligations that

19   CSC explicitly does not have.  Thus, Dr. Bardy may not proceed under either of these

20   theories.

21       In response, Dr. Bardy makes a creative, but ultimately misguided argument.  He

22   argues that the court must "read the contract as a whole and harmonize seemingly

1  conflicting provisions so as to give effect to all provisions." (Resp. (Dkt. # 34) at 8.)  He

2  argues that the overriding purpose of the Agreement is to "facilitate the parties' joint

3  efforts to develop and commercialize medical devices and diagnostic technologies and

4  services," and that the Agreement must be interpreted to effect this purpose.  (*Id.*)  He

5  argues that the exclusions quoted above are "isolated provisions" that the court may

6  ignore if they conflict with the overriding purpose of the Agreement.  (*Id.* at 9-11.)  Dr.

7  Bardy offers an alternative reading of the Agreement that emphasizes the fact that the

8  parties were required to "use commercially reasonable efforts and diligence" in carrying

9  out their obligations under the Agreement.  (*Id.* at 10-11.)  Under this reading, Dr. Bardy

10  argues that he can proceed under a breach of contract theory because he alleges that CSC

11  did not make commercially reasonable efforts to develop and commercialize the mySense

12  Monitor or protect Collaboration IPR.  (*Id.*)

13       This argument may appear coherent at first glance, but accepting it would require

14  ignoring the actual terms of the Agreement.  The Agreement carefully lays out the

15  obligations undertaken by each party.  CSC's obligations were to provide office space

16  (Am. Compl. Ex. A § 2.1), to pay Dr. Bardy an annual cash retainer (*id.* § 3.3), to repay

17  Dr. Bardy's Reimbursable Expenses (*id.* § 3.4), to provide at least $500,000.00 per year

18  in cash funding (*id.* § 4.1), to provide two full time staff members (*id.* § 4.2), and to

19  engage in various cooperative behaviors (*see, e.g.*, *id.* § 5.4, 5.8, 5.9), among other things.

20  The duties of each party are carefully articulated, and there is no generalized duty, or

21  even a hint of one, to develop or commercialize products or bring products to market.

22  There is nothing in the language or structure of the Agreement to suggest that its specific

1  exclusion of such a duty should be ignored to achieve the Agreement's overall purpose.

2  Specific provisions of a contract control over more general terms. *Feibusch v. Integrated*

3  *Device Tech., Inc. Emp. Ben. Plan*, 463 F.3d 880, 885-86 (9th Cir. 2006); *Wright v.*

4  *Safeco Ins. Co. of Am.*, 109 P.3d 1, 8 (Wash. Ct. App. 2004).  Missions, goals, and

5  objectives do not outweigh specific contract terms.  And while it is true that the

6  Agreement's objectives include "the identification of devices . . . for Development and

7  commercialization or other offering by CSC . . . ," this general statement of the parties'

8  objectives does not give CSC an obligation to develop and commercialize products. *Cf.*

9  *Wash. Crab Producers, Inc. v. Mosbacher*, 924 F.2d 1438 (Wash. 1990).  Indeed, the

10  Agreement seems to contemplate the opposite—that CSC has "sole discretion" with

11  respect to development and commercialization and that "CSC will not have any

12  obligation to, and will not have any liability on account of any delay or failure to,

13  Develop, manufacture, market or commercialize any Collaboration Products." (*Id.*

14  § 5.12.)  In short, there is no support for Dr. Bardy's assertion that the overriding purpose

15  of the Agreement was to obligate CSC to develop and commercialize products.

16        It also makes no sense to argue that CSC failed to make "commercially reasonable

17  efforts" to develop and commercialize the mySense Monitor and to protect associated

18  IPR.  The Agreement only requires the parties to "use commercially reasonable efforts

19  and diligence with respect to the performance of their respective obligations under

20  the . . . Agreement . . . ." (*Id.* § 5.2.)  The Agreement clearly states that CSC had no

21  obligation to develop or commercialize products, or to protect any IPR. (*Id.* §§ 5.12,

22  6.6.)  Again, a mission, goal, or objective does not equate to an obligation, particularly

1    where the contract specifically disclaims that same obligation.  (*Id.* §§ 5.12, 6.6.)  Dr.

2    Bardy's argument is not persuasive when considered in light of the actual terms of the

3    Agreement.

4         Dr. Bardy makes one more argument that the court also rejects, although not in its

5    entirety.  Dr. Bardy argues that "Collaboration Plans and Budgets" contemplated by the

6    Agreement create enforceable obligations that override the contract's clear terms.  (Mot.

7    at 13-14.)  Dr. Bardy advances two theories in support of this argument:  first that the

8    Collaboration Plans and Budgets amended the Agreement, and second that the

9    Collaboration Plans and Budgets are actually part of the Agreement.  (Mot. at 13-14.)  It

10   does appear that the agreement contemplated that the parties would create Collaboration

11   Plans and Budgets.  (*See* Am. Compl. Ex. A §§ 5.2, 5.6.)  However, Dr. Bardy has not

12   alleged either of his two theories with enough specificity to meet his pleading obligations

13   under *Iqbal* and *Twombly*.  *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557.  With

14   respect to his first theory, the Agreement allows the parties to modify its terms, but also

15   states that "[n]o modification of this Agreement will be binding on either Party unless in

16   writing and signed by an authorized representative of each Party."  (Am. Compl. Ex. A

17   § 13.7.)  Dr. Bardy has not plausibly alleged that the parties modified the Agreement by a

18   signed writing.  The only specific allegation he makes with respect to modification is that

19   he received an email from CSC CEO Neal Long representing that CSC would "get My

20   Sense [sic] into the market."  (Am. Compl. ¶ 83.)  This is obviously not a writing signed

21   by both parties, and the court cannot reasonably infer from this email that a signed

22   writing exists.  Dr. Bardy has also not alleged that the Collaboration Plans and Budgets

ORDER- 9

1   are signed writings.  (*See* Compl.)  With respect to the second theory, Dr. Bardy has not

2   alleged anything that he believes is contained in the Collaboration Plans or Budgets.  (*See*

3   Compl.)[1]  Specifically, he has not alleged that there is anything in them that would

4   override the parties' specific agreement that CSC would have no obligation to

5   commercialize and develop Collaboration Products.  Absent such specific allegations, he

6   has not stated a plausible claim upon which relief may be granted.  *See Iqbal*, 556 U.S. at

7   678; *Twombly*, 550 U.S. at 557.

8          In light of the above, the court GRANTS CSC's motion to dismiss this claim and

9   DISMISSES Dr. Bardy's breach of contract claims.

10         However, Dr. Bardy's last argument convinces the court that it should provide

11  limited leave to amend with respect to this claim.  Leave to amend is to be freely given

12  when justice so requires.  Fed. R. Civ. P. 15(a). When a defendant moves to dismiss

13  under Federal Rule of Civil Procedure 12(b)(6), "a district court should grant leave to

14  amend even if no request to amend the pleading was made, unless it determines that the

15  pleading could not possibly be cured by the allegation of other facts."  *Cook, Perkiss &*

16  *Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990).  Here, it is possible

17  that Dr. Bardy's pleading could be cured by the allegation of other facts—namely, the

18  existence of a signed writing between the parties modifying the Agreement.

19

_____

20      [1] At oral argument, Dr. Bardy's counsel claimed that this was because Dr. Bardy was not
21  in possession of the Collaboration Plans and Budgets.  This may be true, but according to the
    terms of the Agreement, Dr. Bardy was instrumental in creating the Collaboration Plans and
22  Budgets. (*See* Am. Compl. §§ 5.5-5.6.)  Thus, he must have some idea what is contained in
    them.

1   Accordingly, the court grants Dr. Bardy leave to amend within ten days of the date of this

2   order.  The court will not entertain an amended complaint with respect to the theories

3   described above other than a modification theory.

4   **C.      Promissory Estoppel Claim**

5          Next, the court considers Dr. Bardy's promissory estoppel claim.  Dr. Bardy

6   claims that CSC CEO Neal Long represented to him, in an email, that CSC would "get

7   My Sense [sic] into the market."  (Am. Compl. ¶ 83.)  He alleges the remaining elements

8   of promissory estoppel as well:  that he reasonably relied on this representation by not

9   attempting to exclude the mySense Monitor from the collaboration agreement, that he

10  suffered damages, and that "[i]njustice can be avoided only by enforcing CSC's

11  promise . . . ."  (*Id.* ¶¶ 83-86.)

12         CSC moves to dismiss this claim.  (Mot. at 12-13.)  CSC argues that the claim

13  must be dismissed because a contract governs the parties' dispute, thereby precluding a

14  claim for promissory estoppel.  (*Id.*)  The court agrees.

15         CSC is right on the law.  "[T]he doctrine of promissory estoppel does not apply

16  where a contract governs" the conduct at issue.  *Spectrum Glass Co., Inc. v. Pub. Util.*

17  *Dist. No. 1 of Snohomish Cnty.*, 119 P.3d 854, 861 (Wash. Ct. App.  2005) (citing *Klinke*

18  *v. Famous Recipe Fried Chicken, Inc.*, 616 P.2d 644, 648 n.4 (Wash. 1980)); *see also*

19  *Fawn Lake Maint. Comm'n v. Abers*, 202 P.3d 1019, 1024 (Wash. Ct. App. 2009); *Akmal*

20  *v. Cingular Wireless, Inc.*, No. C06-748JLR, 2007 WL 1725557 (W.D. Wash. June 8,

21  2007), *aff'd*, 300 F. App'x 463 (9th Cir. 2008); *Westcott v. Wells Fargo Bank, N.A.*, 862

22  F. Supp. 2d 1111, 1116 (W.D. Wash. 2012).

1    CSC is right on the facts too.  The Agreement plainly covers the conduct that

2  forms the basis of Dr. Bardy's estoppel claim.  The Agreement governs the parties'

3  responsibilities vis-à-vis development and commercialization of Collaboration Products.

4  (*Id.* Ex. A § 5.12.)  Specifically, the Agreement says that development and

5  commercialization will be "guided and undertaken by CSC in its sole discretion" and that

6  CSC will have no obligation to develop or commercialize products.  (*Id.*)  There can be

7  no doubt that the Agreement reaches the subject of Dr. Bardy's promissory estoppel

8  claim and that, accordingly, Dr. Bardy cannot make a claim for promissory estoppel.

9    Dr. Bardy raises two counterarguments, both of which are unpersuasive.  (*See*

10  Resp. at 16-17.)  First, he argues that he is permitted to plead a promissory estoppel claim

11  in the alternative, citing *Flower v. T.R.A. Indus., Inc.*, 111 P.3d 1192, 1201 (Wash. Ct.

12  App. 2005).  This misses the point.  Dr. Bardy is indeed permitted to plead a promissory

13  estoppel claim in the alternative, like in *Flower*, in case the contract is found to be

14  unenforceable.  *See Flower*, 111 P.3d at 1201.  But here, no one is arguing that the

15  Agreement is unenforceable.  (*See* Am. Compl. ¶ 66.)  Where there is a valid, enforceable

16  contract governing the parties' dispute, there can be no claim for promissory estoppel.

17  *Spectrum Glass*, 119 P.3d at 861.  Second, Dr. Bardy argues that, even where there is a

18  valid contract, a "later inconsistent representation" can form the basis of a promissory

19  estoppel claim, citing *Kuest v. Regent Assisted Living, Inc.*, 43 P.3d 23, 31-32 (Wash. Ct.

20  App. 2002).  Dr. Bardy's citation to *Kuest* is misplaced, and his argument based on *Kuest*

21  fails.  In *Kuest*, the "later inconsistent representation" in question formed the basis for a

22  theory of contract modification that rested on promissory estoppel principles, not a

1    freestanding cause of action for promissory estoppel. *Id.* at 30-31. Here, there is no

2    doubt that Mr. Long's alleged later inconsistent representation did not modify the

3    Agreement, as discussed above. The court rejects this argument.

4         For the reasons discussed above, the court GRANTS CSC's motion to dismiss Dr.

5    Bardy's promissory estoppel claim. The court dismisses this claim with prejudice,

6    finding that "the pleading could not possibly be cured by the allegation of other facts."

7    *Cook, Perkiss & Liehe*, 911 F.2d at 247.

8    **D.    Unjust Enrichment Claim**

9         Next, the court considers Dr. Bardy's unjust enrichment claim. This claim is

10   based on an incident where Dr. Bardy paid money out of his own pocket to a doctor who

11   was working on the mySense Monitor. (Am. Compl. ¶ 89.) He alleges that he "delivered

12   valuable goods to CSC" by paying the doctor "at a critical time in the development of the

13   mySense Monitor when CSC's failure to timely pay the trial doctor threatened FDA

14   approval of the mySense Monitor." (*Id.* ¶ 89-90.) As a result, he claims that CSC has

15   been unjustly enriched. (*Id.* ¶ 92.)

16        CSC moves to dismiss this claim. (Mot. at 13-14.) CSC argues that the law does

17   not allow a claim for unjust enrichment because the Agreement covers the parties'

18   dispute over commercialization, development, and IPR. (*Id.*)

19        CSC is again right on the law. A party cannot bring an action for unjust

20   enrichment where a valid written agreement covers the parties' dispute. *Westcott*, 862

21   F. Supp. 2d at 1116-17; *Chandler v. Wash. Toll Bridge Auth.*, 137 P.2d 97, 103 (Wash.

22   1943) ("A party to a valid express contract is bound by the provisions of that contract,

1  and may not disregard the same and bring an action on an implied contract relating to the

2  same matter, in contravention of the express contract."); *Wash. Ass'n of Child Care*

3  *Agencies v. Thompson*, 660 P.2d 1129, 1132 (Wash. Ct. App. 1983) ("[T]he rule of law

4  generally applicable is that . . . each party is bound by the terms of that contract and may

5  not bring an action relating to the same matter on a theory of 'contract' implied by law, in

6  contravention of the express contract."); *MacDonald v. Hayner*, 715 P.2d 519, 522-23

7  (Wash. Ct. App. 1986) (same).

8         CSC is again right on the facts too.  The Agreement governs the parties' dispute

9  over whether Dr. Bardy should be reimbursed for his out-of-pocket payment to a doctor.

10  Specifically, the Agreement sets forth a procedure under which Dr. Bardy may recover

11  "Reimbursable Expenses."  (Am. Compl. Ex. A § 3.4; *see also id.* § 1 (defining

12  "Reimbursable Expenses").)  For all other expenses, the Agreement states that Dr. Bardy

13  "will not enter into any contract, agreement, or other commitment, or incur any obligation

14  or liability, in the name or otherwise on behalf of CSC."  (*Id.* § 3.5(a).)  This brings Dr.

15  Bardy's decision to pay the trial doctor out of his own pocket within the scope of the

16  Agreement.  As such, it cannot be the basis for an unjust enrichment claim.  *Westcott*, 862

17  F. Supp. 2d at 1116-17.

18         Dr. Bardy makes only one argument to the contrary, and that argument fails.  (*See*

19  Resp. at 17-19.)  Dr. Bardy argues that his payment to the doctor is "removed from the

20  contract's subject matter" and therefore may support an unjust enrichment claim.  (*Id.*)

21  Dr. Bardy is correct that if the parties' dispute is "removed from the confines of the

22  express contract," an action in unjust enrichment is not precluded.  *Pierce County v.*

1  *State*, 185 P.3d 594, 618-19 (Wash. Ct. App. 2008) (citing *Auburn Mech., Inc. v. Lydig*

2  *Const., Inc.*, 951 P.2d 311, 315 (Wash. Ct. App. 1998)).  However, as explained above,

3  the payment to the doctor is not removed from the confines of the Agreement.  Indeed,

4  the Agreement directly addresses the question.  (*See* Am. Compl. Ex. A §§ 1, 3.4, 3.5(a).)

5  Thus, the court rejects Dr. Bardy's argument.

6      For the reasons discussed above, the court GRANTS CSC's motion to dismiss Dr.

7  Bardy's unjust enrichment claim.  The court dismisses this claim with prejudice, finding

8  that "the pleading could not possibly be cured by the allegation of other facts."  *Cook,*

9  *Perkiss & Liehe*, 911 F.2d at 247.

10  **E.      Declaratory Judgment Claim**

11      Last, the court considers Dr. Bardy's claim for declaratory judgment.  Dr. Bardy

12  asks the court to declare that the non-compete and non-solicit clauses contained in the

13  Agreement are unenforceable.  (Am. Compl. ¶¶ 59-64.)  He alleges that the non-compete

14  clause is "unreasonable" and that he is entitled to a declaration that it is unenforceable "as

15  a result of CSC's breaches of the agreement." (*Id.* ¶ 61-63.)  CSC moves to dismiss this

16  claim, arguing that it is conclusory and relies on an invalid theory of breach.  (Mot. at

17  12.)

18      The court agrees that, as currently pleaded, the complaint does not state a plausible

19  claim that the non-compete clause is unenforceable.  In general, Washington courts will

20  enforce covenants not to compete if they are reasonable and lawful.  *Emerick v. Cardiac*

21  *Study Center, Inc., P.S.*, 286 P.3d 689, 692 (Wash. Ct. App. 2012).  To determine if a

22  non-compete clause is unreasonable, Washington courts consider three factors:  (1)

1   whether the restraint is necessary to protect the employer's business or goodwill; (2)

2   whether it imposes on the employee any greater restraint than is reasonably necessary to

3   secure the employer's business or goodwill; and (3) whether enforcing the covenant

4   would injure the public through loss of the employee's service and skill to the extent that

5   the court should not enforce the covenant, i.e., whether it violates public policy.  *Id.*

6   (citing *Perry v. Moran*, 748 P.2d 224, 228 (Wash. 1987).)  Dr. Bardy's complaint does

7   not allege facts pertinent to these factors beyond its assertion of breach of contract, which

8   the court has rejected.  (*See* Am. Compl. ¶¶ 59-64.)  Instead, the complaint merely recites

9   that the non-compete clause is "unreasonable."  (*Id.* ¶ 61.)  The court is not bound to

10   accept as true labels, conclusions, formulaic recitations of the elements, or legal

11   conclusions couched as factual allegations.  *Twombly*, 550 U.S. at 555.  A complaint

12   must do more than tender "'naked assertions' devoid of 'further factual enhancement.'"

13   *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

14          Thus, the court GRANTS CSC's motion to dismiss this claim and DISMISSES the

15   claim without prejudice.  Here, it is possible that the defects in the pleading could be

16   cured by amendment.  *See Cook, Perkiss & Liehe*, 911 F.2d at 247.  Accordingly, the

17   court grants Dr. Bardy leave to amend this claim within ten days of the date of this order.

18   If Dr. Bardy does not file an amended complaint within ten days, the court will dismiss

19   this claim with prejudice.

20                              **III.    CONCLUSION**

21          For the foregoing reasons, the court GRANTS CSC's motion to dismiss (Dkt.

22   # 33), DISMISSES Dr. Bardy's claim for declaratory judgment and breach of contract

1    without prejudice and with leave to amend within ten days of the date of this order, and

2    DISMISSES the remainder of Dr. Bardy's claims with prejudice.  In addition, the court

3    DENIES CSC's pending motion for protective order as moot[2] (Dkt. # 36).

4           Dated this 10th day of October, 2013.

6                                                         _____

7                                                         JAMES L. ROBART

8                                                         United States District Judge

---

21          [2] CSC's motion for protective order requests that the court stay discovery while the court
22   considers this motion to dismiss.  (*See* Mot. for P.O. (Dkt. # 36).)  The court has now ruled on
     the motion to dismiss, making the motion for protective order moot.

ORDER- 17