|  |  |
|---|---|
| 1 | |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| GUST H. BARDY, | CASE NO. C13-0778JLR |
|---|---|
| Plaintiff, | ORDER GRANTING MOTION TO DISMISS |
| v. | |
| CARDIAC SCIENCE CORP., | |
| Defendant. | |

Before the court is Defendant Cardiac Science Corporation's ("CSC") motion to dismiss Plaintiff Dr. Gust H. Bardy's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). (Mot. (Dkt. # 33).) CSC and Dr. Bardy collaborated for several years in researching and developing medical devices, but the relationship eventually soured. CSC and Dr. Bardy's collaboration was governed by a contract, and Dr. Bardy now alleges that CSC breached that contract. Dr. Bardy alleges five causes of action: two for breach of contract, one for promissory estoppel, one for unjust enrichment, and one for declaratory judgment. In this motion, CSC moves to dismiss all five causes of

ORDER- 1

action, arguing a different theory of dismissal for each. The court considers each argument in turn and, having considered the pleadings and held oral argument, and finding all of CSC's arguments to be meritorious, GRANTS CSC's motion and DISMISSES Dr. Bardy's complaint.

## I. BACKGROUND

Both Dr. Bardy and CSC work in the field of heart disease treatment. Dr. Bardy is a cardiologist who has experience designing devices to treat and manage irregular heartbeat conditions and diseases (also called "cardiac arrhythmias"). (First Am. Compl. (Dkt. # 29) ¶ 2.) Dr. Bardy describes himself as an "entrepreneurial cardiologist" with experience designing and executing clinical trials for heartbeat-monitoring devices and conducting research, development, and commercialization for those devices and related software. (*Id.*) CSC is a corporation headquartered in Wisconsin that develops, manufactures, and markets heart-related medical devices such as automated external defibrillators, electrocardiograph devices, and similar devices. (*Id.* ¶ 3.) CSC has "substantial business activities" in King County, Washington. (*Id.*)

Dr. Bardy and CSC signed an agreement to collaborate in December 2009 titled "Collaboration and Consulting Agreement" (hereinafter referred to as "the Agreement"). (*Id.* ¶ 9.) The purpose of the Agreement was to "form a collaboration and consulting agreement to design, develop, manufacture, commercialize, and use medical devices and diagnostic technologies." (*Id.*) Under the Agreement, CSC would provide office space and resources to Dr. Bardy and pay him an annual salary. (*Id.* ¶ 10.) In return, Dr. Bardy

would conduct research and attempt to develop medical devices that could be commercialized by CSC.  (*Id.*)

The collaboration yielded a product called the "mySense Monitor."  (*Id.* ¶ 20.) The mySense Monitor is a wearable electrocardiograph monitor about the size of a large band-aid.  (*Id.*)  It continuously monitors and records the electrical activity of the cardiovascular system and heart and transmits the data to its associated software for review and analysis.  (*Id.*)  Dr. Bardy designed and developed this product, which he claims "represents a significant clinical and cost improvement" over prior technology.  (*Id.* ¶ 21.)  He also obtained United States Food and Drug Administration ("FDA") approval for the product.  (*Id.* ¶ 20.)

However, according to Dr. Bardy, CSC did not do enough to develop the product and bring it to market.  (*Id.* ¶¶ 24-51.)  Dr. Bardy alleges that CSC "failed to take critical and necessary steps for the development of the mySense Monitor" and that, as a result, the product still is not commercially available.  (*Id.* ¶ 24.)  Specifically, Dr. Bardy alleges that CSC failed to pay, or made late payments to, numerous people hired to develop the product, including the main clinical trial doctor, the law firm hired to protect the associated intellectual property rights ("IPR"), the regulatory affairs consultant, the contract manufacturer, and others.  (*Id.* ¶¶ 25, 27-28.)  In addition, Dr. Bardy alleges that CSC failed to provide development services such as software support, legal services, and marketing.  (*Id.* ¶¶ 26, 29, 31.)  Dr. Bardy alleges that this conduct breached the Agreement.  (*Id.* ¶¶ 65-81.)  CSC, for its part, believes that it "has not yet been able to define a business model that will result in an acceptable return on investment."  (*Id.* ¶ 33.)

ORDER- 3

CSC terminated the Agreement on April 9, 2013, (*id.* ¶ 45), and Dr. Bardy filed this complaint against CSC shortly thereafter. (*See* Not. of Removal (Dkt. # 1).) The complaint was originally filed in King County Superior Court, but CSC removed it to this court. (*Id.*) CSC now moves to dismiss the complaint in its entirety under Federal Rule of Civil Procedure 12(b)(6). (*See* Mot.)

## II.   ANALYSIS

**A.   Legal Standard on a Rule 12(b)(6) Motion to Dismiss**

Under Federal Rule of Civil Procedure 12(b)(6), a court should dismiss a complaint if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In determining whether to grant a Rule 12(b)(6) motion, the court must accept as true all "well-pleaded factual allegations" in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Dismissal under Rule 12(b)(6) is appropriate where the complaint lacks sufficient facts to support a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). To sufficiently state a claim and survive a motion to dismiss, the complaint "does not need detailed factual allegations" but the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 663 (internal quotation marks omitted); *see also Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010). The court is not bound to accept as true labels, conclusions, formulaic recitations of the elements, or legal conclusions couched as factual allegations. *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265,

286 (1986)). As the Supreme Court said in *Iqbal*, a complaint must do more than tender "'naked assertions' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

**B.     Breach of Contract Claims**

Dr. Bardy's primary claim is that CSC breached the Agreement by failing to develop and commercialize the mySense Monitor. (Am. Compl. ¶¶ 65-81.) He alleges that the Agreement required CSC to provide resources and make "commercially reasonable efforts" to develop and commercialize the product, and that CSC failed to do that in a variety of ways. (*Id.* ¶¶ 67-68, 70, 72.) Further, he alleges that CSC breached the Agreement by failing to protect the IPR associated with the mySense Monitor. (*Id.* ¶¶ 70-71, 73.) Dr. Bardy alleges two different causes of action for breach of contract—one for injunctive relief, and a second for damages. (*See id.* ¶¶ 65-81.)

CSC moves to dismiss both. (Mot. at 9-12.) CSC argues that Dr. Bardy's breach of contract claims are barred by a provision in the Agreement. (*Id.*) Indeed, there is a provision in the Agreement that says, explicitly, that development and commercialization will be undertaken in the "sole discretion" of CSC and that CSC will not be liable for failing to develop and commercialize products or have any obligation to do so:

> The Development, manufacture, marketing and commercialization of Collaboration Products and the sale, licensing and other disposition of Collaboration Technology and Collaboration IPR, as the case may be, will be guided and undertaken by CSC in its sole discretion. CSC will not have any obligation to, and will not have any liability on account of any delay or failure to, Develop, manufacture, market or commercialize any Collaboration Products or to sell, license or otherwise dispose of any Collaboration Technology or Collaboration IPR.

ORDER- 5

(Am. Compl. Ex. A § 5.12.) CSC argues that Dr. Bardy's breach of contract claims should be dismissed with prejudice because they are based on conduct that falls under the scope of this clause. (Mot. at 9-12.)

The court agrees. All of Dr. Bardy's breach of contract claims are based on one of two theories: first, that CSC failed to make commercially reasonable efforts to develop and commercialize the mySense Monitor, (Am. Compl. ¶¶ 24-26, 28-42, 49, 56-58), and second, that CSC failed to protect the IPR associated with the mySense Monitor. (Compl. ¶¶ 27, 47-51.) Both of these theories are expressly precluded by the terms of the Agreement. With respect to development and commercialization, there is no doubt that the Agreement eliminates any obligation on CSC's behalf to develop and commercialize Collaboration Products when it says: "CSC will not have any obligation to, and will not have any liability on account of any delay or failure to, Develop, manufacture, market or commercialize any Collaboration Products." (Am. Compl. Ex. A § 5.12.) Thus, Dr. Bardy's first theory cannot form the basis of a viable breach of contract claim. With respect to IPR, there is another clause in the Agreement that says explicitly that "each party . . . will have no obligation, to apply for, register, prosecute, perfect, maintain or enforce any of IPR [sic]." (*Id.* § 6.6.) Thus, it is clear that CSC had no obligation to protect IPR. (*See id.*) There can be no breach of contract claim based on obligations that CSC explicitly does not have. Thus, Dr. Bardy may not proceed under either of these theories.

In response, Dr. Bardy makes a creative, but ultimately misguided argument. He argues that the court must "read the contract as a whole and harmonize seemingly

ORDER- 6

conflicting provisions so as to give effect to all provisions." (Resp. (Dkt. # 34) at 8.) He argues that the overriding purpose of the Agreement is to "facilitate the parties' joint efforts to develop and commercialize medical devices and diagnostic technologies and services," and that the Agreement must be interpreted to effect this purpose. (*Id.*) He argues that the exclusions quoted above are "isolated provisions" that the court may ignore if they conflict with the overriding purpose of the Agreement. (*Id.* at 9-11.) Dr. Bardy offers an alternative reading of the Agreement that emphasizes the fact that the parties were required to "use commercially reasonable efforts and diligence" in carrying out their obligations under the Agreement. (*Id.* at 10-11.) Under this reading, Dr. Bardy argues that he can proceed under a breach of contract theory because he alleges that CSC did not make commercially reasonable efforts to develop and commercialize the mySense Monitor or protect Collaboration IPR. (*Id.*)

This argument may appear coherent at first glance, but accepting it would require ignoring the actual terms of the Agreement. The Agreement carefully lays out the obligations undertaken by each party. CSC's obligations were to provide office space (Am. Compl. Ex. A § 2.1), to pay Dr. Bardy an annual cash retainer (*id.* § 3.3), to repay Dr. Bardy's Reimbursable Expenses (*id.* § 3.4), to provide at least $500,000.00 per year in cash funding (*id.* § 4.1), to provide two full time staff members (*id.* § 4.2), and to engage in various cooperative behaviors (*see, e.g.*, *id.* § 5.4, 5.8, 5.9), among other things. The duties of each party are carefully articulated, and there is no generalized duty, or even a hint of one, to develop or commercialize products or bring products to market. There is nothing in the language or structure of the Agreement to suggest that its specific

exclusion of such a duty should be ignored to achieve the Agreement's overall purpose. Specific provisions of a contract control over more general terms. *Feibusch v. Integrated Device Tech., Inc. Emp. Ben. Plan*, 463 F.3d 880, 885-86 (9th Cir. 2006); *Wright v. Safeco Ins. Co. of Am.*, 109 P.3d 1, 8 (Wash. Ct. App. 2004). Missions, goals, and objectives do not outweigh specific contract terms. And while it is true that the Agreement's objectives include "the identification of devices . . . for Development and commercialization or other offering by CSC . . . ," this general statement of the parties' objectives does not give CSC an obligation to develop and commercialize products. *Cf. Wash. Crab Producers, Inc. v. Mosbacher*, 924 F.2d 1438 (Wash. 1990). Indeed, the Agreement seems to contemplate the opposite—that CSC has "sole discretion" with respect to development and commercialization and that "CSC will not have any obligation to, and will not have any liability on account of any delay or failure to, Develop, manufacture, market or commercialize any Collaboration Products." (*Id.* § 5.12.) In short, there is no support for Dr. Bardy's assertion that the overriding purpose of the Agreement was to obligate CSC to develop and commercialize products.

It also makes no sense to argue that CSC failed to make "commercially reasonable efforts" to develop and commercialize the mySense Monitor and to protect associated IPR. The Agreement only requires the parties to "use commercially reasonable efforts and diligence with respect to the performance of their respective obligations under the . . . Agreement . . . ." (*Id.* § 5.2.) The Agreement clearly states that CSC had no obligation to develop or commercialize products, or to protect any IPR. (*Id.* §§ 5.12, 6.6.) Again, a mission, goal, or objective does not equate to an obligation, particularly

ORDER- 8

where the contract specifically disclaims that same obligation. (*Id.* §§ 5.12, 6.6.) Dr. Bardy's argument is not persuasive when considered in light of the actual terms of the Agreement.

Dr. Bardy makes one more argument that the court also rejects, although not in its entirety. Dr. Bardy argues that "Collaboration Plans and Budgets" contemplated by the Agreement create enforceable obligations that override the contract's clear terms. (Mot. at 13-14.) Dr. Bardy advances two theories in support of this argument: first that the Collaboration Plans and Budgets amended the Agreement, and second that the Collaboration Plans and Budgets are actually part of the Agreement. (Mot. at 13-14.) It does appear that the agreement contemplated that the parties would create Collaboration Plans and Budgets. (*See* Am. Compl. Ex. A §§ 5.2, 5.6.) However, Dr. Bardy has not alleged either of his two theories with enough specificity to meet his pleading obligations under *Iqbal* and *Twombly*. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557. With respect to his first theory, the Agreement allows the parties to modify its terms, but also states that "[n]o modification of this Agreement will be binding on either Party unless in writing and signed by an authorized representative of each Party." (Am. Compl. Ex. A § 13.7.) Dr. Bardy has not plausibly alleged that the parties modified the Agreement by a signed writing. The only specific allegation he makes with respect to modification is that he received an email from CSC CEO Neal Long representing that CSC would "get My Sense [sic] into the market." (Am. Compl. ¶ 83.) This is obviously not a writing signed by both parties, and the court cannot reasonably infer from this email that a signed writing exists. Dr. Bardy has also not alleged that the Collaboration Plans and Budgets

ORDER- 9

are signed writings. (*See* Compl.) With respect to the second theory, Dr. Bardy has not alleged anything that he believes is contained in the Collaboration Plans or Budgets. (*See* Compl.)[1] Specifically, he has not alleged that there is anything in them that would override the parties' specific agreement that CSC would have no obligation to commercialize and develop Collaboration Products. Absent such specific allegations, he has not stated a plausible claim upon which relief may be granted. *See Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 557.

In light of the above, the court GRANTS CSC's motion to dismiss this claim and DISMISSES Dr. Bardy's breach of contract claims.

However, Dr. Bardy's last argument convinces the court that it should provide limited leave to amend with respect to this claim. Leave to amend is to be freely given when justice so requires. Fed. R. Civ. P. 15(a). When a defendant moves to dismiss under Federal Rule of Civil Procedure 12(b)(6), "a district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990). Here, it is possible that Dr. Bardy's pleading could be cured by the allegation of other facts—namely, the existence of a signed writing between the parties modifying the Agreement.

---

[1] At oral argument, Dr. Bardy's counsel claimed that this was because Dr. Bardy was not in possession of the Collaboration Plans and Budgets. This may be true, but according to the terms of the Agreement, Dr. Bardy was instrumental in creating the Collaboration Plans and Budgets. (*See* Am. Compl. §§ 5.5-5.6.) Thus, he must have some idea what is contained in them.

ORDER- 10

Accordingly, the court grants Dr. Bardy leave to amend within ten days of the date of this order. The court will not entertain an amended complaint with respect to the theories described above other than a modification theory.

## C. Promissory Estoppel Claim

Next, the court considers Dr. Bardy's promissory estoppel claim. Dr. Bardy claims that CSC CEO Neal Long represented to him, in an email, that CSC would "get My Sense [sic] into the market." (Am. Compl. ¶ 83.) He alleges the remaining elements of promissory estoppel as well: that he reasonably relied on this representation by not attempting to exclude the mySense Monitor from the collaboration agreement, that he suffered damages, and that "[i]njustice can be avoided only by enforcing CSC's promise . . . ." (*Id.* ¶¶ 83-86.)

CSC moves to dismiss this claim. (Mot. at 12-13.) CSC argues that the claim must be dismissed because a contract governs the parties' dispute, thereby precluding a claim for promissory estoppel. (*Id.*) The court agrees.

CSC is right on the law. "[T]he doctrine of promissory estoppel does not apply where a contract governs" the conduct at issue. *Spectrum Glass Co., Inc. v. Pub. Util. Dist. No. 1 of Snohomish Cnty.*, 119 P.3d 854, 861 (Wash. Ct. App. 2005) (citing *Klinke v. Famous Recipe Fried Chicken, Inc.*, 616 P.2d 644, 648 n.4 (Wash. 1980)); *see also Fawn Lake Maint. Comm'n v. Abers*, 202 P.3d 1019, 1024 (Wash. Ct. App. 2009); *Akmal v. Cingular Wireless, Inc.*, No. C06-748JLR, 2007 WL 1725557 (W.D. Wash. June 8, 2007), *aff'd*, 300 F. App'x 463 (9th Cir. 2008); *Westcott v. Wells Fargo Bank, N.A.*, 862 F. Supp. 2d 1111, 1116 (W.D. Wash. 2012).

CSC is right on the facts too.  The Agreement plainly covers the conduct that forms the basis of Dr. Bardy's estoppel claim.  The Agreement governs the parties' responsibilities vis-à-vis development and commercialization of Collaboration Products.  (*Id.* Ex. A § 5.12.)  Specifically, the Agreement says that development and commercialization will be "guided and undertaken by CSC in its sole discretion" and that CSC will have no obligation to develop or commercialize products.  (*Id.*)  There can be no doubt that the Agreement reaches the subject of Dr. Bardy's promissory estoppel claim and that, accordingly, Dr. Bardy cannot make a claim for promissory estoppel.

Dr. Bardy raises two counterarguments, both of which are unpersuasive.  (*See* Resp. at 16-17.)  First, he argues that he is permitted to plead a promissory estoppel claim in the alternative, citing *Flower v. T.R.A. Indus., Inc.*, 111 P.3d 1192, 1201 (Wash. Ct. App. 2005).  This misses the point.  Dr. Bardy is indeed permitted to plead a promissory estoppel claim in the alternative, like in *Flower*, in case the contract is found to be unenforceable.  *See Flower*, 111 P.3d at 1201.  But here, no one is arguing that the Agreement is unenforceable.  (*See* Am. Compl. ¶ 66.)  Where there is a valid, enforceable contract governing the parties' dispute, there can be no claim for promissory estoppel.  *Spectrum Glass*, 119 P.3d at 861.  Second, Dr. Bardy argues that, even where there is a valid contract, a "later inconsistent representation" can form the basis of a promissory estoppel claim, citing *Kuest v. Regent Assisted Living, Inc.*, 43 P.3d 23, 31-32 (Wash. Ct. App. 2002).  Dr. Bardy's citation to *Kuest* is misplaced, and his argument based on *Kuest* fails.  In *Kuest*, the "later inconsistent representation" in question formed the basis for a theory of contract modification that rested on promissory estoppel principles, not a

freestanding cause of action for promissory estoppel. *Id.* at 30-31. Here, there is no doubt that Mr. Long's alleged later inconsistent representation did not modify the Agreement, as discussed above. The court rejects this argument.

For the reasons discussed above, the court GRANTS CSC's motion to dismiss Dr. Bardy's promissory estoppel claim. The court dismisses this claim with prejudice, finding that "the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe*, 911 F.2d at 247.

**D.     Unjust Enrichment Claim**

Next, the court considers Dr. Bardy's unjust enrichment claim. This claim is based on an incident where Dr. Bardy paid money out of his own pocket to a doctor who was working on the mySense Monitor. (Am. Compl. ¶ 89.) He alleges that he "delivered valuable goods to CSC" by paying the doctor "at a critical time in the development of the mySense Monitor when CSC's failure to timely pay the trial doctor threatened FDA approval of the mySense Monitor." (*Id.* ¶ 89-90.) As a result, he claims that CSC has been unjustly enriched. (*Id.* ¶ 92.)

CSC moves to dismiss this claim. (Mot. at 13-14.) CSC argues that the law does not allow a claim for unjust enrichment because the Agreement covers the parties' dispute over commercialization, development, and IPR. (*Id.*)

CSC is again right on the law. A party cannot bring an action for unjust enrichment where a valid written agreement covers the parties' dispute. *Westcott*, 862 F. Supp. 2d at 1116-17; *Chandler v. Wash. Toll Bridge Auth.*, 137 P.2d 97, 103 (Wash. 1943) ("A party to a valid express contract is bound by the provisions of that contract,

and may not disregard the same and bring an action on an implied contract relating to the same matter, in contravention of the express contract."); *Wash. Ass'n of Child Care Agencies v. Thompson*, 660 P.2d 1129, 1132 (Wash. Ct. App. 1983) ("[T]he rule of law generally applicable is that . . . each party is bound by the terms of that contract and may not bring an action relating to the same matter on a theory of 'contract' implied by law, in contravention of the express contract."); *MacDonald v. Hayner*, 715 P.2d 519, 522-23 (Wash. Ct. App. 1986) (same).

CSC is again right on the facts too. The Agreement governs the parties' dispute over whether Dr. Bardy should be reimbursed for his out-of-pocket payment to a doctor. Specifically, the Agreement sets forth a procedure under which Dr. Bardy may recover "Reimbursable Expenses." (Am. Compl. Ex. A § 3.4; *see also id.* § 1 (defining "Reimbursable Expenses").) For all other expenses, the Agreement states that Dr. Bardy "will not enter into any contract, agreement, or other commitment, or incur any obligation or liability, in the name or otherwise on behalf of CSC." (*Id.* § 3.5(a).) This brings Dr. Bardy's decision to pay the trial doctor out of his own pocket within the scope of the Agreement. As such, it cannot be the basis for an unjust enrichment claim. *Westcott*, 862 F. Supp. 2d at 1116-17.

Dr. Bardy makes only one argument to the contrary, and that argument fails. (*See* Resp. at 17-19.) Dr. Bardy argues that his payment to the doctor is "removed from the contract's subject matter" and therefore may support an unjust enrichment claim. (*Id.*) Dr. Bardy is correct that if the parties' dispute is "removed from the confines of the express contract," an action in unjust enrichment is not precluded. *Pierce County v.*

ORDER- 14

*State*, 185 P.3d 594, 618-19 (Wash. Ct. App. 2008) (citing *Auburn Mech., Inc. v. Lydig Const., Inc.*, 951 P.2d 311, 315 (Wash. Ct. App. 1998)). However, as explained above, the payment to the doctor is not removed from the confines of the Agreement. Indeed, the Agreement directly addresses the question. (*See* Am. Compl. Ex. A §§ 1, 3.4, 3.5(a).) Thus, the court rejects Dr. Bardy's argument.

For the reasons discussed above, the court GRANTS CSC's motion to dismiss Dr. Bardy's unjust enrichment claim. The court dismisses this claim with prejudice, finding that "the pleading could not possibly be cured by the allegation of other facts." *Cook, Perkiss & Liehe*, 911 F.2d at 247.

### E. Declaratory Judgment Claim

Last, the court considers Dr. Bardy's claim for declaratory judgment. Dr. Bardy asks the court to declare that the non-compete and non-solicit clauses contained in the Agreement are unenforceable. (Am. Compl. ¶¶ 59-64.) He alleges that the non-compete clause is "unreasonable" and that he is entitled to a declaration that it is unenforceable "as a result of CSC's breaches of the agreement." (*Id.* ¶ 61-63.) CSC moves to dismiss this claim, arguing that it is conclusory and relies on an invalid theory of breach. (Mot. at 12.)

The court agrees that, as currently pleaded, the complaint does not state a plausible claim that the non-compete clause is unenforceable. In general, Washington courts will enforce covenants not to compete if they are reasonable and lawful. *Emerick v. Cardiac Study Center, Inc., P.S.*, 286 P.3d 689, 692 (Wash. Ct. App. 2012). To determine if a non-compete clause is unreasonable, Washington courts consider three factors: (1)

ORDER- 15

whether the restraint is necessary to protect the employer's business or goodwill; (2) whether it imposes on the employee any greater restraint than is reasonably necessary to secure the employer's business or goodwill; and (3) whether enforcing the covenant would injure the public through loss of the employee's service and skill to the extent that the court should not enforce the covenant, i.e., whether it violates public policy. *Id.* (citing *Perry v. Moran*, 748 P.2d 224, 228 (Wash. 1987).) Dr. Bardy's complaint does not allege facts pertinent to these factors beyond its assertion of breach of contract, which the court has rejected. (*See* Am. Compl. ¶¶ 59-64.) Instead, the complaint merely recites that the non-compete clause is "unreasonable." (*Id.* ¶ 61.) The court is not bound to accept as true labels, conclusions, formulaic recitations of the elements, or legal conclusions couched as factual allegations. *Twombly*, 550 U.S. at 555. A complaint must do more than tender "'naked assertions' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Thus, the court GRANTS CSC's motion to dismiss this claim and DISMISSES the claim without prejudice. Here, it is possible that the defects in the pleading could be cured by amendment. *See Cook, Perkiss & Liehe*, 911 F.2d at 247. Accordingly, the court grants Dr. Bardy leave to amend this claim within ten days of the date of this order. If Dr. Bardy does not file an amended complaint within ten days, the court will dismiss this claim with prejudice.

### III. CONCLUSION

For the foregoing reasons, the court GRANTS CSC's motion to dismiss (Dkt. # 33), DISMISSES Dr. Bardy's claim for declaratory judgment and breach of contract

without prejudice and with leave to amend within ten days of the date of this order, and DISMISSES the remainder of Dr. Bardy's claims with prejudice. In addition, the court DENIES CSC's pending motion for protective order as moot[2] (Dkt. # 36).

Dated this 10th day of October, 2013.

JAMES L. ROBART
United States District Judge

---

[2] CSC's motion for protective order requests that the court stay discovery while the court considers this motion to dismiss. (*See* Mot. for P.O. (Dkt. # 36).) The court has now ruled on the motion to dismiss, making the motion for protective order moot.