UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| GUST H. BARDY, <br><br> Plaintiff, <br><br> v. <br><br> CARDIAC SCIENCE CORP., <br><br> Defendant. | CASE NO. C13-0778JLR <br><br> ORDER ON PARTIAL MOTION TO DISMISS |

## I. INTRODUCTION

Before the court is Defendant Cardiac Science Corporation's ("CSC") motion to dismiss the second cause of action in Plaintiff Dr. Gust H. Bardy's third amended complaint. (*See* Mot. (Dkt. # 52).) CSC and Dr. Bardy collaborated for several years in researching and developing medical devices, but the relationship eventually soured. CSC and Dr. Bardy's collaboration was governed by a contract and Dr. Bardy alleges that CSC breached that contract. (*See* 3d. Am. Compl. (Dkt. # 50).) CSC now moves to dismiss Dr. Bardy's claim for breach of contract. Having considered the submissions of the

ORDER- 1

parties, the balance of the record, and the relevant law, and no party having requested oral argument, the court DENIES in part and GRANTS in part CSC's motion to dismiss.

## II.    FACTS

Both Dr. Bardy and CSC work in the field of heart disease treatment. Dr. Bardy is a cardiologist who has experience designing devices to treat and manage irregular heartbeat conditions and diseases (also called "cardiac arrhythmias"). (3d Am. Compl. ¶ 2.) Dr. Bardy describes himself as an "entrepreneurial cardiologist" with experience designing and executing clinical trials for heartbeat-monitoring devices and conducting research, development, and commercialization for those devices and related software. (*Id.*) CSC is a corporation that develops, manufactures, and markets heart-related medical devices such as automated external defibrillators, electrocardiograph devices, and similar devices. (*Id.* ¶ 3.)

Dr. Bardy and CSC signed an agreement to collaborate in December 2009 titled "Collaboration and Consulting Agreement" (hereinafter referred to as "the Agreement"). (*Id.* ¶ 8.) The purpose of the Agreement was to "form a collaboration and consulting agreement to design, develop, manufacture, commercialize, and use medical devices and diagnostic technologies." (*Id.*) Under the Agreement, CSC would provide at least $500,000.00 in funding, as well as office space, other resources, and an annual salary of $175,000.00 to Dr. Bardy. (*Id.* ¶¶ 9, 10.) In return, Dr. Bardy would conduct research and attempt to develop medical devices that could be commercialized by CSC. (*Id.*)

The collaboration yielded a product called the "mySense Monitor." (*Id.* ¶ 19.) The mySense Monitor is a wearable electrocardiograph monitor about the size of a large

band-aid. (*Id.*) It continuously monitors and records the electrical activity of the cardiovascular system and heart and transmits the data to its associated software for review and analysis. (*Id.*) Dr. Bardy designed and developed this product, which he claims "represents a significant clinical and cost improvement" over prior technology. (*Id.* ¶ 20.) He also obtained United States Food and Drug Administration ("FDA") approval for the product. (*Id.* ¶ 21.)

The parties' activities under the Agreement were termed the "Collaboration Program." (*Id.* ¶ 8.) The Collaboration Program was coordinated by a Steering Committee consisting of Dr. Bardy and three CSC executive officers. (*Id.* ¶ 22.) The Steering Committee could act only upon the approval of Dr. Bardy and two of the three CSC executives. (Am. Compl. Ex. A (Dkt. # 29) ("Agreement") ¶ 5.5.)[1] One of the Steering Committee's main functions was to formulate and approve Collaboration Plans and Budgets. (*Id.*) Dr. Bardy and CSC agreed that:

> Subject to the terms and conditions of this Agreement, the Parties will cooperate to perform the Collaboration Program in accordance with the Collaboration Plans and Budgets and other directions of the Steering Committee.

(*Id.* ¶ 5.2.) Dr. Bardy alleges that the parties "intended that the Collaboration Plans and Budgets be incorporated into and/or modify the Agreement." (3d Am. Compl. ¶ 28.)

---

[1] The Agreement is properly before the court on this motion to dismiss because it is incorporated by reference into the third amended complaint. *See United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("A court may, however, consider certain materials—documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice—without converting the motion to dismiss into a motion for summary judgment.").

The Collaboration Plan and Budget adopted for the 2012 calendar year allocated $2.5 million to fund Dr. Bardy's activities under the Agreement. (*Id.* ¶ 26.) Dr. Bardy alleges that, based on this and other Collaboration Plans and Budgets, he did not seek to exclude the mySense Monitor from the Collaboration Program as was his "right" under the Agreement. (*Id.* ¶ 29.)

Dr. Bardy does not provide copies of any Collaboration Plans and Budgets with his third amended complaint. (*See id.* ¶ 30.) Nonetheless, he alleges that CSC breached the obligations set forth in these plans in four ways: that CSC failed to pay the Collaboration's main trial doctor working to support FDA approval of the mySense Monitor; that CSC failed to pay legal fees to an intellectual property law firm; that CSC failed to pay the contract manufacturer of the mySense monitor; and that CSC failed to assign an internal product manager to the mySense Monitor product. (*Id.* ¶ 32-35.)

On April 9, 2013, CSC sent Dr. Bardy a letter unilaterally terminating the Agreement. (*Id.* ¶ 40.) Pursuant to the Agreement, if CSC's termination is not predicated on Dr. Bardy's material breach of the Agreement, CSC must continue to pay Dr. Bardy monthly severance payments for one year. (Agreement ¶ 10; 3d. Am. Compl. ¶ 42.) Dr. Bardy alleges that, as of the date CSC terminated the Agreement, he had performed all of his material obligations under the Agreement. (3d. Am. Compl. ¶ 41.) He also alleges that CSC has not made any severance payments to him. (*Id.* ¶ 43.)

This court previously dismissed Dr. Bardy's contract claim to the extent it was premised on the theory that the Agreement generally obligated CSC to make "commercially reasonable efforts" to develop and commercialize the mySense Monitor

and that CSC breached the Agreement by failing to undertake such efforts. (*See* 10/10/13 Order (Dkt. # 43) at 5-10; *see also* Am. Order (Dkt. # 49).) Dr. Bardy amended his complaint to focus on the obligations allegedly created by the Collaboration Plans and Budgets. (*See generally* 3d Am. Compl.) CSC now moves to dismiss Dr. Bardy's contract claim for the second time. (*See generally* Mot.)

### III. ANALYSIS

**A. Motion to Dismiss Standard**

Under Federal Rule of Civil Procedure 12(b)(6), a court must dismiss a complaint if it fails to state a claim upon which relief can be granted. Fed. R. Civ. P. 12(b)(6). In determining whether to grant a Rule 12(b)(6) motion, the court must accept as true all "well-pleaded factual allegations" in the complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Dismissal for failure to state a claim "is proper if there is a lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory." *Conservation Force v. Salazar*, 646 F.3d 1240, 1242 (9th Cir. 2011).

To survive a motion to dismiss, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The complaint must contain "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 663 (internal quotation marks omitted); *see also Telesaurus VPC, LLC v. Power*, 623 F.3d 998, 1003 (9th Cir. 2010). The court is not bound to accept as true labels, conclusions, formulaic recitations of the elements, or legal conclusions couched as factual allegations. *Twombly*, 550 U.S. at 555 (citing *Papasan v. Allain*, 478 U.S. 265,

286 (1986)). As the Supreme Court said in *Iqbal*, a complaint must do more than tender "'naked assertions' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

**B.     Collaboration Plan and Budgets**

Dr. Bardy claims that CSC breached both the terms of the original Agreement and additional obligations imposed by the Collaboration Plans and Budgets. In this section, the court addresses Dr. Bardy's contract claim premised on the Collaboration Plan and Budgets.

**1.    Incorporation into the Agreement**

Dr. Bardy alleges that "[t]he parties intended that the Collaboration Plans and Budgets be incorporated into and/or modify the Agreement and impose additional, specific obligations on the Parties . . . ." (3d Am. Compl. ¶ 28.) The terms of the Agreement are consistent with Dr. Bardy's allegation. For instance, the Agreement not only contemplates that the parties will adopt Collaboration Plans and Budgets—it requires it. (*See* Agreement ¶ 5.5 ("Within thirty (30) days after the Effective Date, the Steering Committee will meet to begin formulation of the initial Collaboration Plan and Budget, and within sixty (60) days . . . the Steering Committee will meet to review and approve the initial Collaboration Plan and Budget."))

The Agreement also provides that both parties will act in accordance with the Collaboration Plans and Budgets, stating:

> Subject to the terms and conditions of this Agreement, the Parties will cooperate to perform the Collaboration Program in accordance with the

Collaboration Plans and Budgets and other directions of the Steering Committee.

(*Id.* ¶ 5.2.) Additionally, the Agreement effectively incorporates the terms of future Collaboration Plans and Budgets into several of the Agreement's provisions. (*See, e.g.*, *Id.* ¶ 3.1 ("Dr. Bardy will perform for CSC, as part of the Collaboration Program, such services as may be specified in the Collaboration Plans and Budgets . . . ."), ¶ 3.2 ("Dr. Bardy will . . . perform his services in accordance with any applicable schedule set forth in the Collaboration Plans and Budgets."), ¶ 5.2(b) ("CSC will be responsible for providing resources for the Collaboration Program . . . as set forth in the applicable Collaboration Plans and Budgets.").

Moreover, the Collaboration Plans and Budgets were created and adopted by the Steering Committee, which could only act with the approval of Dr. Bardy and two other CSC executive officers. (*Id.* ¶ 5.5). As such, the Collaboration Plans and Budgets represent further agreements by the parties. Taking into account the foregoing terms of the Agreement, Dr. Bardy has plausibly alleged that the parties intended to incorporate the Collaboration Plans and Budgets into their Agreement.[2]

---

[2] CSC argues that Dr. Bardy's claim fails because he has not shown that the Collaboration Plans and Budgets modified the parties' original Agreement. (Mot. at 4.) It is well-established that contract modification requires consideration separate from that of the original contract. *Wagner v. Wagner*, 621 P.2d 1279, 1284 (Wash. 1980). CSC contends that Dr. Bardy has not shown additional consideration. (Mot. at 4, Reply (Dkt. # 55) at 6-7.) However, because the court finds that Dr. Bardy has plausibly alleged the alternative theory that the Collaboration Plan and Budgets were incorporated into the Agreement, the court need not reach the issue of modification.

ORDER- 7

### 2. Duty to Commercialize the mySense Monitor

Dr. Bardy once again raises—and the court once again rejects—the theory that CSC had a general, overarching duty to develop and commercialize the mySense Monitor. (*See* Resp. (Dkt. # 54) at 5-6; 10/10/13 Order at 5-10; Am. Order.) Although the third amended complaint does not directly allege this theory, Dr. Bardy nonetheless argues in his response brief that "through the Collaboration Plans and Budgets, CSC affirmatively assumed a duty—to fund the development and commercialization of the mySense Monitor—that it has previously disavowed." (Resp. at 5.) Dr. Bardy is incorrect.

This court already held that this theory is expressly precluded by the terms of the Agreement. (*See* 10/10/13 Order at 6; Am. Order.) There is no doubt that the Agreement eliminates any obligation on CSC's behalf to develop and commercialize products arising out of the Collaboration Program when it says: "CSC will not have any obligation to, and will not have any liability on account of any delay or failure to, Develop, manufacture, market, or commercialize any Collaboration Products." (Agreement ¶ 5.12.) Rather than establishing an affirmative duty to commercialize products, the Agreement provides that the "[d]evelopment, manufacture, marketing, and commercialization of Collaboration Products . . . will be guided and undertaken by CSC in its sole discretion." (Agreement ¶ 5.12.)

Dr. Bardy identifies only four additional obligations allegedly imposed by the Collaboration Plans and Budgets: paying a trial doctor, retaining an intellectual property law firm, paying a contract manufacturer, and assigning a product manager. (Compl.

¶ 32-35.) Dr. Bardy also identifies an increased budget allocating $2.5 million towards Dr. Bardy's activities under the Agreement. (*Id.* ¶ 26.) However, merely increasing the funding and resource support for Dr. Bardy's activities in no way vitiates or overrides Section 5.12's express disclaimer of an overarching duty to commercialize products. After all, Section 5.12's disclaimer coexisted peacefully with the original Agreement's funding and resources provisions. (*See, e.g.*, Agreement ¶ 4.1 (guaranteeing funding of at least $500,000.00 per year and two full-time employees).)

Dr. Bardy provides no sound reason why the funding provisions in the Collaboration Plans and Budgets create a duty to commercialize the mySense Monitor that effectively nullifies Section 5.12. To the contrary, a contract should be interpreted as a whole such that every term in the contract is given effect and force. *Boeing Co. v. Aetna Cas. & Sur. Co.*, 784 P.2d 507, 511 (Wash. 1990) (en banc). Interpretations that contradict and thereby nullify clauses within the contract are disfavored. *See Stouffer & Knight v. Cont'l Cas. Co.*, 982 P.2d 105, 110 (Wash. Ct. App. 1999). Section 5.2 of the Agreement states that the parties' cooperation in accordance with the Collaboration Plans and Budgets remains "[s]ubject to the terms and conditions of [the] Agreement." (Agreement ¶ 5.2.) Thus, interpreting the Agreement as a whole, any additional funding or resource commitments in the Collaboration Plan and Budgets remain subject to the terms of the original Agreement, including Section 5.12's preclusion of an obligation to commercialize any products. Accordingly, the court dismisses Dr. Bardy's contract claim that CSC owes a general duty to commercialize and develop the mySense Monitor. Because this is the second time the court has dismissed this claim and Dr. Bardy has

raised no new arguments, the claim is dismissed without leave to amend. *See Cook, Perkiss & Liehe v. N. Cal. Collection Serv.*, 911 F.2d 242, 247 (9th Cir. 1990).

**3. Damages**

It remains possible for Dr. Bardy to maintain a claim for breach of the specific terms and provisions expressly included in the Collaboration Plans and Budgets. Such a claim ultimately founders, however, on Dr. Bardy's failure to allege damages. As Dr. Bardy concedes, damages are an essential element of a breach of contract claim. *See Crabtree v. Bowers*, No. 45043-3-I, 102 Wash. App. 1017 at *1 (Wash. Ct. App. 2000); (Resp. at 6 n.13). And yet, Dr. Bardy devotes only one sentence of his third amended complaint to damages, stating simply: "Dr. Bardy has suffered damages as a result of CSC's breach of the Agreement and of its obligations agreed to between the Parties and as set forth in the Collaboration Plans and Budgets." (3d Am. Compl. ¶ 71.) But the court is not bound to accept as true mere conclusions or formulaic recitations of the elements of a claim. *Twombly*, 550 U.S. at 555 (citing *Papasan*, 478 U.S. at 286). Rather, a complaint must do more than tender "'naked assertions' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557). Here, Dr. Bardy's naked assertion that the alleged breach of contract has damaged him is inadequate to survive a motion to dismiss.

Dr. Bardy in his response brief offers two theories of damages relevant to this claim, both of which are insufficient. First, Dr. Bardy argues that he is entitled to lost profits that he would have accrued absent CSC's alleged breach. (Resp. at 6.) Dr. Bardy identifies two ways in which he could have been compensated for the commercialization

of the mySense Monitor: milestone payments and royalties. (*Id.* at 6 n.14.) Specifically, under the Agreement, Dr. Bardy would receive a milestone payment if yearly revenue from a collaboration product sold by CSC reached a certain threshold; the amount of the payment would depend on the level of revenue reached. (Agreement ¶ 7.1.) In addition, Dr. Bardy would also earn a "percentage of the net consideration" received by CSC for the sale or licensing of all other collaboration technology and intellectual property. (*Id.* ¶ 7.2.)

The Agreement, however, also contains a limitation of liability that explicitly precludes recovery of lost profits:

> Neither party will be liable to the other with respect to the subject matter of this agreement for any incidental, indirect, consequential, special, or punitive damages, or lost profits . . . regardless of whether any such claim for damages, lost profits, or other costs is based on tort, warranty, contract or any other legal theory . . . ."

(*Id.* ¶ 11.3). As such, Dr. Bardy's damages claim for royalties, which constitutes a paradigmatic example of lost profits, is barred. The court notes that the milestone payments arguably do not fall under the traditional definition of lost profits. After all, Dr. Bardy is not seeking profits from the sale of the products themselves but rather lump sum payments hard-coded into the terms of the Agreement. Even so, Dr. Bardy's complaint fails to adequately allege these damages.

Specifically, the complaint does not state a plausible claim that but for the commitments CSC allegedly breached—namely, paying a trial doctor, intellectual property law firm, and contract manufacturer and appointing a product manager—Dr. Bardy would have received milestone payments due to sales of the mySense Monitor.

ORDER- 11

*See Larsen v. Walton Plywood Co.*, 390 P.2d 677, 686 (Wash. 1964) (stating that damages are only recoverable if they are "the proximate result of a breach"). There is no indication that these four commitments (or other unidentified obligations in the Collaboration Plans and Budgets) were sufficient to achieve commercialization of the mySense Monitor. And CSC had no affirmative duty to continue commercializing the mySense Monitor beyond the obligations found in the Collaboration Plans. Even assuming that the mySense Monitor was eventually fully commercialized, there is no indication that sales would have reached the revenue levels necessary to earn Dr. Bardy a milestone payment.

Damages must be established with reasonable certainty; speculative, uncertain, and conjectural damages are not recoverable. *Tiegs v. Watts*, 954 P.2d 877, 886 (1998); *see also Layman v. Swanson*, 3 Wash. 2d 370, 379, 101 P.2d 304, 308 (1940). Here, Dr. Bardy makes no direct allegations of lost earnings and the inferences that can be drawn from his complaint do not rise above conjecture. Conjecture, however, is not enough: to survive a motion to dismiss, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. This is a level which Dr. Bardy's complaint fails to reach.

Dr. Bardy's second theory of damages is that CSC's failure to pay various vendors harmed Dr. Bardy's "reputation, relationship, and standing with the network of contractors and suppliers who support him in his entrepreneurial efforts." (Resp. at 6.) As discussed above, the Agreement expressly precludes liability for consequential damages. (*See* Agreement ¶ 11.3). Consequential damages are "losses that do not flow

directly and immediately from an injurious act, but that result indirectly from the act."
*Park Ave. Condo. Owners Ass'n v. Buchan Developments, L.L.C.*, 71 P.3d 692, 701 (Wash. Ct. App. 2003) (quoting Black's Law Dictionary 394 (7th Ed.1999)). Dr. Bardy's claim of reputational harm falls neatly within the definition of consequential damages, and therefore is barred.[3] Even if this theory were not barred by the Agreement's limitation of liability provision, Dr. Bardy's third amended complaint is devoid of allegations supporting the theory. (*See* 3d. Am. Compl. ¶ 51 (alleging only that Dr. Bardy introduced contractors and suppliers from his entreprenurial "network" to CSC).)

Therefore, Dr. Bardy's contract claim for breach of the specific provisions of the Collaboration Plans and Budgets is dismissed for a failure to plead damages. Because it is possible that Dr. Bardy may be able to cure these deficiencies by alleging additional facts, the court grants Dr. Bardy leave to amend the complaint within ten days of the date of this order. *See Cook*, 911 F.2d at 247. Leave to amend is granted with respect to this contract theory only.

**C.     Severance Payments**

Last, the court turns to Dr. Bardy's claim for breach of contract based on CSC's failure to make severance payments. The Agreement provides that CSC may terminate the Collaboration Program "(i) at any time on or after the first anniversary of the Effective Date [December 6, 2010], or (ii) in the event that Dr. Bardy breaches any of his

---

[3] The court notes that Dr. Bardy's claim for lost milestone payments also meets this definition of consequential damages. For this reason also, Dr. Bardy fails to adequately allege damages.

material obligations under this Agreement and fails to cure the material breach within ninety (90) days . . . ." (Agreement ¶ 10.2; 3d. Am. Compl. ¶ 11). If CSC terminates the Agreement early and Dr. Bardy is not in material breach:

> CSC will continue to pay Dr. Bardy the monthly installments of the consulting consideration under Section 3.2 [sic] for a period commencing with the first day after the last day of the Term and ending upon the later of (i) the fourth (4th) anniversary of the Effective Date or (ii) twelve (12) months after the end of the Term.

(Agreement ¶ 10.3(b); 3d. Am. Compl. ¶ 12.) Dr. Bardy's consulting consideration was an annual cash retainer of $175,000.00. (Agreement ¶ 3.3; 3d. Am. Compl. ¶ 10.)

Dr. Bardy alleges that CSC sent Dr. Bardy a letter unilaterally terminating the Agreement on April 09, 2013. (3d. Am. Compl. ¶ 40.) Dr. Bardy also alleges that, as of the termination date, Dr. Bardy had performed all of his material obligations under the Agreement. (*Id.* ¶ 41.) According to the terms of the Agreement, CSC was required to continue to pay Dr. Bardy severance payments for the next twelve months in the total amount of $175,000.00. (*Id.* ¶ 42.) But Dr. Bardy also alleges that CSC has not made any severance payments to Dr. Bardy. (*Id.* ¶ 43.) Therefore, Dr. Bardy has alleged all elements of a breach of contract claim. *Lehrer v. State Dep't of Soc. & Health Servs.*, 5 P.3d 722, 727 (Wash. Ct. App. 2000) ("Generally, a plaintiff in a contract action must prove a valid contract between the parties, breach, and resulting damage.") Accordingly, CSC's motion to dismiss Dr. Bardy's contract claim based on the Agreement is denied.

//

//

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part CSC's motion to dismiss (Dkt. # 52).  Dr. Bardy is granted partial leave to amend within 10 days of the date of this order.

Dated this 26th day of January, 2014.

JAMES L. ROBART
United States District Judge